**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIBRA MAX,<br><br>                                 *Plaintiff*,<br><br>          -against-<br><br>BARBARA H. URBACH LISSNER,<br><br>                                 *Defendant*. | Case No. _____<br><br><br>**COMPLAINT**<br>**AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Libra Max ("Libra"), the daughter of the iconic artist Peter Max ("Peter"), as and for her Complaint against Defendant Barbara H. Urbach Lissner, Esq. ("Lissner"), alleges as follows:

## I.       NATURE OF THE ACTION

1.       In this Complaint, Libra asserts three causes of action: (1) for Lissner's intentional and/or reckless infliction upon Libra of severe emotional distress; (2) for Lissner's violation of New York's laws prohibiting SLAPP suits (*i.e.*, strategic lawsuits against public participation); and (3) for Lissner's violation of Judiciary Law Section 487 for lying to the court as an attorney.

2.       Attorney Barbara Lissner, a stranger to the Max family, is Peter Max's court-appointed personal needs guardian in an unfathomably inhumane and predatory guardianship which has forcibly isolated Peter from his loved ones for the past ***three years*** and which is currently pending before the Honorable Lisa A. Sokoloff in New York State Supreme Court.

3.       As a result of three years of abusive isolation under Lissner's iron grip and the crippling emotional trauma such isolation has caused Peter Max, together with Lissner's medical neglect, Peter's physical health has dramatically plummeted; he is now on 24/7 oxygen, can

barely talk, and can no longer walk.  Peter Max is at the end of his life.

4.      Just last month, astonishingly, Lissner removed Peter's oxygen without having him evaluated by a Pulmonologist, in violation of hospital recommendations.  Libra witnessed the devastating effects on her father when Lissner denied him oxygen.  Moreover, Lissner refuses to allow Libra to take Peter to a Pulmonologist.  Lissner has not permitted Libra to take her own father to a doctor for three years.

5.      Lissner is a financial predator who has made it her life's mission in the past three years to dismantle the beautiful life of the 84-year-old devoted father, Holocaust survivor, and famed and beloved Pop Artist and icon, Peter Max, whose life was once bustling with his loving children and family, lifelong friends, celebrations and community.  Peter was famously social and is a traditional Jewish family man, and his children were the center of his world.  This first week of June, 2022, marks three full years that Lissner has cruelly kept Peter in forced isolation from everyone he loves, at the end of his life.  *Critically, Lissner's isolation of Peter began 10 months before COVID.*

6.      Peter is one of the most prolific artists of our time and was famously in a perpetual state of creativity.  For his entire life until Lissner's appointment, Peter surrounded himself with luminaries in the fields of art, science and music.  He thrived on conversation, intellectual stimulation, and human interaction, and was lost without it.  It is part of his DNA.

7.      Lissner took one of the greatest minds of our time and thrust him into a world of deafening white noise, surrounded by a rotating cast of paid aides who know nothing of his life and who sat him in front of a television for three years.

8.      The shock to Peter's system by being forced into this disorienting and empty world was not only devastating to Peter, but sent a ripple of devastation through Peter's

extensive community of friends and loved ones who had to hear him on the phone repeatedly begging for companionship and to be rescued from his loneliness.

9.      Since her appointment, Lissner has engaged in a cruel and vindictive campaign of harassment against Peter's loving and only daughter, Libra, for no reason other than that Libra has been fighting to free her father from isolation, and because she exposed Lissner's abuse and financial exploitation of her father.  *See, e.g.*, www.FreePeterMax.com.

10.     For many years before Lissner, Peter's Alzheimer's was stable and he was high functioning.  He was also in excellent physical health and walked miles a day.  By all accounts, from the moment Lissner began isolating Peter, his cognitive, emotional and physical deterioration was rapid.  Lissner's abhorrent treatment of Peter steeply hastened his decline, and she is wrongfully hastening his death.

11.     All of this destruction caused by one woman:  Barbara H. Urbach Lissner, Esq.

12.     By anybody's standard, isolating a senior from their family at the end of their life, against their will, is exceptionally cruel and harmful.  And in return for her "services," Lissner's disgustingly inflated, unconscionable bill is understood to be over **$2,000,000.00**.

13.     Lissner has a history of preying on the elderly and vulnerable, having been involved in at least three contentious guardianships before Peter's.  She was berated by a Supreme Court Judge in New York for transparently seeking to enrich herself at an incapacitated person's expense.  In a published ruling, the Judge stated: "*[i]t would be an understatement to declare that this court is outraged by the behavior exhibited by the interested parties* [*i.e.,* Barbara Lissner and her co-conspirator husband, Michael Lissner]—*parties who were supposed to protect the person, but who have all unabashedly demonstrated through their actions in connection with the person that they are only interested in getting paid*." *See Matter of*

*Carl Willner (F.G.)*, 2014 NY Slip Op 51675(U) (Sup. Ct., 2014) (emphasis added).

14.     Lissner should never have been assigned as Peter's guardian with this published and public declaration of her previous predatory behavior.  Lissner's actions in isolating Peter from his family and seeking to extract enormous fees for her purported "services" are simply part of her playbook.

15.     Because of the trauma Peter sustained at a young age as a Holocaust survivor and having most of his family killed by the Nazis, his worst fear is being separated from his family. Thanks to Lissner, Peter is now living his own worst nightmare.

16.     Peter's most fundamental constitutional and human rights are being violated as part of a spiteful campaign to exclude Libra, who has appropriately called public attention to Lissner's morally repugnant conduct.

17.     Libra, having grown up with her father and grandparents in the shadow of the Holocaust, has been acutely aware from a young age of her family's generational trauma and the palpable loss of almost all of Peter's family.  Now, at the end of Peter's life, the horror of hearing her own father's voice filled with fear and begging for companionship on the other end of the phone for over three years is a devastation that no child of an aging parent in failing health should have to endure.  The separation of parent and child, orchestrated by Lissner, has terrorized and retraumatized Peter and has destroyed both his and Libra's lives.

18.     Peter himself, together with Libra and Peter's family members and lifelong friends, are united against Lissner:  It is clear she considers her famed ward as nothing more than a cash cow.

19.     Lissner's severe isolation of Peter from his daughter and family is abusive and undeniably contrary to constitutional protections over the familial right of a family to remain

together.

20.     In one particularly heartless act, Lissner took away Peter's most beloved rescued cats that he was deeply attached to—a stunningly cruel act given the emotional comfort they provided him after Lissner had already isolated him from his children, family and loved ones.

21.     Under Lissner's tyrannical rule, she currently forbids Peter from seeing his children except for only 1.5 hours, three times per week.  The visits are unnecessarily monitored by both audio and visual electronic surveillance, which Lissner watches from her cellphone, as well as in-person supervision by two paid observers.  (Exhibit 5) (Photographs).  No normalcy or familial intimacy allowed.  This is akin to visits in a high security prison with a convicted felon.

22.     In addition, Lissner has only allowed Peter to see a handful of dearest lifelong friends in three years, also strictly surveilled and time limited.

23.     No one in Peter's loving community and extended family, including Libra, is a danger to Peter.  There is no reason for this draconian control over Peter's life; it is irrational and punitive.

24.     By everyone's account—including in multiple affidavits not only submitted by Peter's loved ones, but by both of Peter's prior guardians—Libra has always had a gentle, loving, and respectful relationship with her father.

25.     These restrictions are designed to harass and intimidate Libra and undermine the few moments she has with her beloved father.

26.     These restrictions are also designed to enable Lissner to financially fleece Peter: a cornerstone in the abuse of the elderly is removing family oversight.  Isolation enables financial exploitation.

27.     Lissner has caused irreversible harm to both Peter and Libra.  Peter will never get

this time back with his family and his family will never get this time back with him.

28.     During the three years of Lissner's rule, Peter has begged family and friends for companionship, as described in numerous heartbreaking affidavits in the guardianship court. As Peter's three years of isolation progressed, his repeated pleas to Libra, family and friends over the phone became more intensified and desperate, begging repeatedly for them to come see him and saying repeatedly that he was confused and frightened as to why he was alone.

29.     The sound of pain and desperation in Peter's voice has been unspeakably devastating to Libra and all those who love him—he must think his daughter and loved ones have abandoned him and cannot fathom why they cannot accept his invitations to visit.

30.     Lissner has clearly caused Peter horrific emotional pain. *See, e.g.*, Exhibit 10, (Affidavit of Allan Jacubowicz, Peter's friend of over 40 years), ¶ 7 ("When I was finally able to speak with Peter for the first time last month – the result of a court order that Libra obtained – he sounded like a person who had been in the desert for weeks without water. He was thirsty and dying for companionship and warmth, and it broke my heart. It was clear that the isolation he had suffered was hurting him deeply."); Exhibit 11 (Affidavit of Edward Tricomi, Peter's friend of over 40 years), ¶ 8 ("On every call we have had with Peter, he begs to see us, and he begs us to call him over and over. Please come, please visit me, please come see me, please call me, every day. It breaks my heart … It is clear that he is starved for emotional connection, and that he desperately wants to see the people he loves. I really hurt for him.")

31.     It is a universally held understanding that the ending of a parent's life, and ultimate passing of a parent, is one of the most traumatic and painful experiences that anyone will ever endure. That Lissner has kept Libra away from her father, for three years, during this most meaningful period when he needs her the most has exponentially intensified Libra's

suffering and grief to a level beyond words.  Witnessing her father endure so much emotional

pain in his last years is a trauma Libra will never recover from.

32.     Against Peter's wishes, Lissner has also cruelly barred Libra from any knowledge

of her father's medical condition or involvement in his medical care.  Peter has been taken to the

hospital by ambulance multiple times since Lissner's appointment, including recently to the ICU.

33.     During Peter's recent admission to the ICU, Lissner banned Peter's doctors and

nurses from telling Libra *any* information about her father's health as she sat and watched her

father in a hospital bed hooked up to machines.

34.     When Lissner visited the hospital, she slammed the door to Peter's hospital room

in Libra's face, so Lissner could talk to Peter's doctors without Libra hearing.  She also directed

that Peter's medical team pass notes over Libra's head to Peter's aides about his health

specifically so that Libra could not know what was going on with her own father.

35.     No child should have to endure the utter torment of sitting by a parent's beside in

an ICU not being allowed to know if your parent's breath will be their last.

36.     Lissner has fabricated allegations of wrongdoing by Libra, which is classic

whistleblower retaliation and intimation—attempting to discredit those who are witnesses to

abuse and exploitation.

37.     This diabolical technique of attacking a concerned daughter is a disgraceful

perversion of the intent of New York's guardianship laws.

38.     Peter has been a ward—a person under guardianship—since 2015.  Neutral

guardians were originally appointed to protect Peter from the well-documented abuse of his now-

deceased wife.  But it was not until Lissner's appointment in June 2019 that Peter's life was

shattered:  Peter's prior guardians did not interfere with his family relationships, in accordance

with the appointment order which expressly states that the guardian may not deny Peter contact with his children.

39.     With the suicide of Peter's wife in June 2019, the need for the guardianship ended.  At that time, Peter should have been afforded his clearly stated wishes to be cared for by his children at the end of his life (*see* video of Peter Max at Exhibit 1) and to have his children make medical decisions for him to the extent he is unable (*see* video of Peter Max at Exhibit 3).

40.     Lissner claims that she respects Peter's wishes and acts in accordance with them to the fullest extent possible.  This is a lie.

41.     When Lissner first began isolating Peter, when he could still speak, Peter made his wishes crystal clear in his very own words:  he wants Lissner out of his life; he wants to see his children whenever he pleases; and he wants to be "free."  As Peter has stated in his own words (Exhibits 1 and 2):

- "I don't even know who [Lissner] is";
- "How do I tell her [*i.e.,* Lissner] to stop, to get out of our lives?";
- "I want this lady [*i.e.,* Lissner] to be out of my and your life";
- "Who's the judge?  …. [I want to talk to her] [t]omorrow, the next day, really fast";
- "I love you, I want you to be free with me, and I want to be free with you";
- "You're my daughter, I love you, we should be free with each other";
- "I decide who goes to my own home";
- "No one makes decisions for me or you, we decide for ourselves"; and
- "I'm your father and you're my daughter, we're twins."

42.     Lissner peddles to the guardianship court the notion that his children's love and affection can be replaced by that of his aides.[1]  This ridiculous notion is not only false, but

---

[1] *See, e.g.*, Affidavit of Lissner dated November 12, 2021, ¶ 4 ("[T]his guardianship … enables Peter to be surrounded by people who care for him."); *id.*, ¶ 22 ("Peter is not isolated … he has established close relationships with the individuals that care for him day-in and day-out.")

utterly cruel.

43.     The glaring, unanswered (and unanswerable) question is this:  why can't Peter spend his days with his *children and loved ones,* rather than his *aides*?

44.     Peter has also stated his staunch desire to have his children, not a stranger like Lissner, make medical decisions on his behalf.  (Exhibits 3 and 4).  Lissner egregiously overrules Peter's clearly stated end of life wishes.

45.     In 2015, Peter was placed under guardianship.  But whatever Peter was told about guardianship at that time, he certainly:

    a.  did *not* consent to being forbidden by a stranger from seeing his children;

    b.  did *not* consent to having his lifelong, well-known wishes – such as his desire to be cared for by his children – being categorically ignored;

    c.  did *not* consent to having a complete stranger make medical decisions for him;

    d.  did *not* consent to having his children banned from knowing anything about his medical condition;

    e.  did *not* consent to being forcibly kept in his apartment almost 24 hours a day;

    f.  did *not* consent to the removal of his beloved rescued cats;

    g.  did *not* consent to being surveilled 24-hours a day in his home through cameras with a direct feed to a guardian's cell phone;

    h.  did *not* consent to having no visitors, ever, in his home, which had for decades been a hive of bustling activity filled with love and laughter;

    i.  did *not* consent to having to ask permission to make phone calls to the outside world, including to his children;

    j.  did *not* consent to having his loved ones sign complex and daunting non-disclosure agreements as a pre-requisite to having any contact with him; and

    k.  he certainly did *not* consent to paying strangers millions of dollars to dismantle his life.

46.     Libra—having been forcibly separated from her ailing father at the end of his life and deprived of any information about his medical condition—has suffered severe emotional

trauma; as a result, among other things, she now suffers from insomnia, chest pain, difficulty breathing, and severe anxiety and depression that have required medical attention.

47.     Before Lissner's isolation of her father, Libra was an extremely social, happy, gregarious individual and had a meaningful and joyful life.  Now Libra's days and nights have been narrowed down to a never-ending experience of unrelenting pain, fear, and grief for her father that never leaves her.  Her once-joyful life has now been replaced by full time lawyers and lawsuits, in her race against time to free her father from Lissner's abuse.  Lissner has transformed Libra's once-happy life into a living hell and caused her trauma she will never recover from.

48.     It is impossible to put a money value on the many lost years of irreplaceable time spent between an elderly father and a loving daughter.  Peter and Libra will never get this time back.

49.     Lissner must be held accountable for her ruthless and inhuman actions.

50.     Lissner's latest act was the filing of a frivolous defamation complaint against Libra which is riddled with lies.  *See Barbara H. Urbach Lissner v. Libra Max and Edward Tricomi* (Sup. Ct., N.Y. Co.) (Index No. 161133/2021) (the "Defamation Complaint").  Lissner's Defamation Complaint is as blatant of a violation of New York's recently expanded laws prohibiting SLAPP suits as there possibly could be:  there is no question that Lissner's suit is "an action involving public petition and participation" (*see* N.Y. Civ. Rights Law §§ 70-a(1) and 76-a(1)), and there is similarly no question that her suit "was commenced … without a substantial basis in fact and law" (*id.*, § 70-a(1)(a)), since, among other things, Libra's statements were absolutely privileged as a "fair and true report" of the guardianship proceeding (*id.*, § 74).

51.     Finally, Lissner – an attorney – has also repeatedly lied to the guardianship court

about Libra, with the intent of deceiving that court and the parties into believing that Libra is a threat to her father (without any evidence to support her lies), thereby justifying the continuation of her lucrative guardianship.  Lissner has also lied repeatedly to the guardianship court about Peter's wishes, and her compliance with them, with the intent to deceive the court into believing that Peter condones the extreme isolation that she is subjecting him to.

52.     Libra has personally spent or otherwise incurred an obligation to pay millions of dollars in legal fees to refute Lissner's lies in an attempt to free her father from isolation.

53.     Lissner's lies will ultimately be exposed through, among other things, video evidence that Libra has in her possession, together with the video evidence that Lissner has in her possession through the myriad video cameras that she installed in Peter's home that monitor his every move (and which have been the subject of multiple litigation holds).

54.     By this action, Libra seeks damages resulting from Lissner's flagrant deceptions which, under the applicable statute, are trebled.  *See* N.Y. Judiciary Law, § 487.

55.     Having been sued by Lissner (in a meritless case) and facing the looming death of her father under unnecessarily tragic circumstances caused and controlled by Lissner, Libra brings this suit to recover for the harm that Lissner has caused her (and her father); to hold Lissner accountable for her transparent attempt to curtail Libra's constitutional right to free speech; and to recover the extensive fees Libra has expended in fighting against Lissner's lies.

## II.     <u>PARTIES</u>

56.     Plaintiff Libra Max is a natural person and the only daughter of Peter Max, the world-famous painter.  Libra maintains a residence in Manhattan but is a citizen of the State of California.

57.     Defendant Barbara Lissner is a natural person.  Lissner is a citizen of the State of

New Jersey.  In June 2019, she was appointed by the New York State Supreme Court as Peter Max's personal needs guardian.

### III.    JURISDICTION AND VENUE

58.    This Court has diversity jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and the matter is between citizens of different states.

59.    This Court has general personal jurisdiction over Lissner under Fed. R. Civ. P. 4(k)(1)(A) and CPLR § 301, because Lissner is an attorney admitted to practice law in the State of New York and practices law through her law firm, Lissner & Lissner LLP, located at 162 W 56th Street, #506, New York, NY 10019.  Thus, she has continuous and systemic contacts with New York.

60.    This Court also has specific personal jurisdiction over Lissner Fed. R. Civ. P. 4(k)(1)(A) and CPLR § 302(a)(1) and (2), because she transacts business within this state and has committed a tortious act within this state, and the claims against her arise from those contacts with New York.

61.    Venue is proper in this district under 28 U.S.C. § 1339(b), because a substantial part of the events or omissions giving rise to this lawsuit occurred in this district.

62.    Lissner waived any right to compel Libra to seek guardianship court permission to bring this lawsuit because, among other things, Lissner, acting in her personal capacity, is suing Libra for money damages in her Defamation Complaint outside of the guardianship court. Lissner is similarly being sued in this Complaint in her personal capacity for money damages. Thus, her ward's assets are in no way exposed, nor does he face any potential liability.  There is thus no legitimate basis for seeking permission from the guardianship court to sue.

## IV.     BACKGROUND

### A.     LISSNER'S ATROCIOUS CONDUCT HAS CAUSED LIBRA SEVERE EMOTIONAL DISTRESS

63.     Peter's wife committed suicide on June 9, 2019.  With Mary Max's death, the need for the personal needs guardianship ended.  Lissner received her commission to act as Peter's personal needs guardian the very next day, June 10, 2019.

#### 1.     Lissner Has Prevented Any Meaningful Interaction Between Peter, Libra, And His Loved Ones, Against Peter's Wishes, For Three Years

64.     Lissner's isolation of Peter started immediately upon her appointment, which, critically, began 10 months before COVID.

65.     Lissner has dismantled Peter's life and isolated him to such an alarming and saddening degree that Libra was left with no choice but to make three motions over the course of the past three years seeking Lissner's removal for Peter's welfare:  her first application was filed in September 2019; her second application was filed in May 2020; and her third application was filed in September 2021, which is still pending before Justice Lisa A. Sokoloff in New York State Supreme Court.

66.     Libra's applications have been supported by many of Peter's family and loved ones, detailing Peter's loving relationship with his children and desire to be cared for by them, and his repeated cries for help to be freed from Lissner's rule.  (Exhibits 10-16).

67.     Libra's applications have also been supported by both of Peter's prior personal needs guardians, Sabrina Morrissey, Esq. and Ruth Lippin, Esq.  (Exhibits 8 and 9).  Ms. Lippin stated, among other things, that: (a) "after Mary's passing, [she] believed that it was in Peter's best interest to live with either one of his children, or have a shared arrangement where Libra and Adam alternated staying with him" (Exhibit 8, ¶ 4); (b) she "always feel[s] that, if the children

13

are willing, it is better for a parent to be cared for by his children or some other family member that have a loving emotional attachment to the person with dementia" (*id.*, ¶ 5); and (c) "[w]arm and loving contacts with either family members or friends is encouraged for a person with dementia" (*id.*, ¶ 12).  Ms. Morrissey expressed her belief, among other things, that "[a]ny individual with dementia benefits from stimulating conversation and interactions, particularly with persons with whom he or she has a history."  (Exhibit 9, ¶ 23).

68.     Notwithstanding the views of both of Peter's prior guardians, and notwithstanding the pleas of Peter's family and loved ones and their numerous heartbreaking testimonials about Peter and Libra's beautiful relationship, over the course of her three-year reign, and against Peter's lifelong and well-known wishes, Lissner has, unforgivably:

    a.   denied Peter's wish to be taken care of by his daughter, who wants to care for him, just as he did for his own father, which is the Max family culture;

    b.   banned anyone from visiting Peter in his home – including his own children – for two and a half years, relegating visits to one hour on a park bench, even in New York's inclement winter weather;

    c.   when visits were finally permitted inside Peter's apartment (Libra's childhood home) after two and half years—for just 1.5 hours, three times per week— visits were and are closely surveilled and electronically recorded both audibly and visually (Exhibit 5);

    d.   refused Peter his wish to shelter-in-place with his daughter, forcing him into further devastating isolation during COVID;

    e.   for months, demanded that the only interaction that Peter could have with Libra was for Libra to walk six feet behind him where he was not permitted to "stop, stand or sit";

    f.   confined Peter to his apartment almost 24-hours a day;

    g.   forced Peter to spend three tortuous years with a rotating cast of paid strangers rather than family and friends;

h.  banned Libra completely from seeing her father because Libra went to check on her father after a health scare—Libra had to get a court order to reinstate her ability to see her father;

i.  ignored Peter's desperate pleas to be with his family;

j.  installed cameras that record 24-hour video and audio footage of Peter in his own home, in violation of Peter's privacy rights and civil liberties;

k.  took away Peter's beloved rescued cats;

l.  took away Peter's cell phone and refused to allow his friends to know his new number; Peter did not speak to anyone other than his children for 10 months;

m.  refused to allow Peter to know the phone number to his own phone;

n.  refused to allow Peter to know the unlock code to his own phone;

o.  when Peter was finally able to speak to friends, forced Peter to hang up the phone on them mid-conversation;

p.  directed Peter's dearest friends to sign an onerous non-disclosure agreement before they were allowed any contact with him (Exhibit 17);

q.  allowed Peter to see only a handful of friends in three years;

r.  forced Peter to spend his 84th birthday on a park bench for just one hour only with Libra; Lissner cruelly denied a request from Peter's loved ones to have a small gathering for his birthday (Exhibit 6);

s.  forced Peter, for three years, to celebrate holidays and birthdays without his family and friends;

t.  forced Peter to adhere to a militaristic daily schedule to which he was not accustomed;

u.  banned Peter's aides from speaking a single word to Libra;

v.  harassed Libra through multiple verbally abusive, inflammatory and accusatory emails disparaging Libra's relationship with her father; and

w.  vilified Libra in the guardianship court, and now in her Defamation Complaint, for trying to free her father and for exposing Lissner's abuse.

69.  As the above demonstrates, it was as if Lissner had made a list of everyone and everything that mattered to Peter—everyone and everything that he cherished and looked

forward to—and took it all away.

70.     As noted, even to this very day, and despite Peter's recent hospitalization, the restrictions on Peter's indoor "visits" with Libra continue to be punitively onerous:  limited as they are to three 1.5 hour, strictly surveilled, visits per week.

71.     Libra is not a danger to her father and there is no reason she should be kept from him:  Libra has always had a beautiful relationship with her father.  *See, e.g.*, Exhibit 12 (Affidavit of Peter's first cousin, Susyn Gliedman), ¶ 4 ("Our clan is as close as close can be. Peter called his family his "Mishpoocha' which means 'tribe' in Yiddish."); *id.*, ¶ 7 ("Libra has always been the apple of Peter's eye and his love.  She is the joy of his life.  He adores her. Nothing comes before her, and she embodies family to him.  They are extremely close.  She looks like his mother Sala.  To deprive him of having Libra care for him at his age is abuse, pure and simple.  I cannot imagine why anyone would keep Libra from caring for Peter, nor can I imagine him without his beloved daughter at this time."); Exhibit 8 (Affirmation of Ruth Lippin, Esq., Peter's prior personal needs guardian), ¶ 4 ("Libra was always kind, calm and compassionate to her father.  I never witnessed her engage in any behavior that would lead me to believe it was not safe for Libra to be alone with her father."); Exhibit 9 (Affirmation of Sabrina Morrissey, Esq., Peter's prior personal needs guardian), ¶ 14 ("I never thought that either Libra or Adam presented a threat to their father or that he would be unsafe when he was with either of them.  It was clear that [Peter] loves both of his children dearly.")

72.     As noted above, Lissner has not only cruelly isolated Peter from Libra, but from every single other person Peter cares about.  **Is *everyone* a danger to Peter?  What is Lissner's excuse for keeping *everyone* away?**

73.     Peter arrived in Brooklyn as a teenage immigrant, with the hope for the American

dream and a love for freedom.  He built his career from nothing, and through his hard work and

his embracing of all the opportunities America offered, he became one of America's most

successful artists:  He painted for six American Presidents on both sides of the isle; his works are

on permanent display at Presidential Libraries and US Embassies; and he spearheaded the

renovation of our Lady Liberty monument in NY Harbor when she was is disrepair.  The

excitement that Peter felt when he arrived on America's shores has never waned and is still

palpable in the patriotic themes that have been a constant in his artwork for over 60 years.

74.     It is the Max family culture to take care of their own; Peter moved his own father,

Libra's grandfather, Jacob, into the family home for the last years of his life, where he was given

the gift of spending his final years with his family, enveloped by love, affection, warmth and

celebration.  (Exhibit 7) (Photographs).

75.     Keeping his family together at all costs is Peter Max's number one priority, which

everyone close to him knows.  It is unfathomable that Peter is being denied the right to see his

family at the end of his life.  Lissner is emotionally torturing Peter by depriving him of his most

sacred beloved family.

76.     Medical studies have found that "[l]oneliness can accelerate cognitive decline in

older adults, and isolated individuals are twice as likely to die prematurely";[2] that "[l]ack of

stimulation will cause the brain to atrophy," that "brain stimulation protects against Alzheimer's

and cognitive decline," and that "leading a life with social connection, purpose, and brain

---

[2] *See* https://www.nytimes.com/2016/12/22/upshot/how-social-isolation-is-killing-us.html ("Loneliness
can accelerate cognitive decline in older adults, and isolated individuals are twice as likely to die prematurely as
those with more robust social interactions .… All told, loneliness is as important a risk factor for early death as
obesity and smoking.")

stimulation, protects, and restores brain health";[3] and that "kissing, hugging, snuggling, and holding hands … can have many benefits including laying the foundation for cognitive, social and emotional well-being."[4]  Yet Lissner socially isolates Peter; does not stimulate his brain; and prohibits physical affection from loved ones.

77.    It is devastating that every time Libra sees her father he has deteriorated further, and it is inexplicable and irrational that Peter's paid aides—strangers with whom Peter has no history—are spending this time with him when he desperately wants to be with his daughter and she wants to be with him.  How can this be justified?

78.     Lissner's abuse of Peter has so accelerated his decline such that he can no longer walk or barely talk.  Libra has had to witness this drastic decline in her father, being completely powerless to stop it.

79.    Libra's anxiety and trauma caused by Lissner's brutal isolation of Peter has been exponentially exacerbated over the past month since his hospitalization when, at this urgent juncture, any given day could very well be his last – and yet Lissner continues to forbid Libra from seeing her father for more than a few hours per week.  Lissner's actions are nothing less than sadistic.

80.    Libra's inability to spend any meaningful time with her father since Lissner's appointment, as she watches him move closer to death by the day, has caused her to live in a

---

[3] *See* https://www.apollohealthco.com/brain-stimulation/#:~:text=Lack%20of%20stimulation%20will%20cause,lack%20of%20stimulation%20increases%20risk ("Lack of stimulation will cause the brain to atrophy.  As might be expected, brain stimulation protects against Alzheimer's and cognitive decline, while a lack of stimulation increases risk.  Fortunately, stimulation can heal and strengthen the brain after cognitive decline from neurological diseases, such as Alzheimer's disease, or traumatic brain injury. Thus, leading a life with social connection, purpose, and brain stimulation, protects, and restores brain health.")

[4] *See* https://www.pennmedicine.org/updates/blogs/health-and-wellness/2018/february/affection ("Science shows that kissing, hugging, snuggling, and holding hands produce more than just magical moments …. It is important to remember that Oxytocin is part of a complex system of neurohormones, but when it's released by physical touch it can have many benefits including laying the foundation for cognitive, social and emotional well-being.")

perpetual and relentless state of grief and worry which has manifested itself in, among other things, insomnia, chest pain, difficulty breathing, and severe anxiety and depression that have required medical attention.

81.    Barbara Lissner has terrorized Libra's life.

82.    Lissner knows the excessive trauma she is inflicting on Libra by preventing her from spending meaningful time with her father:  not only has Libra now spent three years and millions of dollars fighting to free her father from Lissner's iron grip (the ferocity of Libra's litigiousness is a reflection of the extent of her pain), but can there be any doubt that a stranger who forcibly separates a loving daughter from her father at the end of his life, for no reason other than vindictiveness and personal financial gain, and then perpetuates lies in a malicious and prolonged smear campaign against her, will cause her emotional distress?

### 2.    Lissner Vindictively Withholds Information Regarding Peter's Health From His Children, Against Peter's Wishes, For Three Years

83.    Lissner has staked out the punitive position that Libra may not know any information whatsoever about her father's health and medical condition, contrary to the position of past guardians.

84.    Lissner mercilessly continues to withhold Peter's medical information from Libra, while she seemingly enjoys the pain she is inflicting on a grieving daughter.

85.    Lissner freely gives out Peter's medical information to the revolving door of non-medical staff in Peter's home.

86.    Lissner's refusal to share such medical information is contrary to the order governing her appointment, and directly contradicts Peter's wishes.

87.    As noted above, Libra has recently had to endure the sheer terror of seeing her father in the ICU in a life-or-death situation while Lissner banned the doctors from telling her a

single word about her own father's health.  Libra sat beside her father's hospital bed, completely in the dark about her father's condition.

88.     Peter has encountered multiple significant medical setbacks over the course of Lissner's appointment about which Lissner has flatly refused to share information with Libra in spite of Peter wanting Libra to know, causing Libra severe distress.  Libra has also witnessed medical neglect by Lissner, being powerless to help her father—a devastating situation for any child to witness in relation to their beloved parent.

89.     Just this week Libra learned that Lissner had been instructed to take Peter to a Pulmonologist upon his discharge from the hospital.  Not only did Lissner ignore that hospital instruction, but went so far as to remove Peter's oxygen without having Peter evaluated by a Pulmonologist.

90.     Libra witnessed the devastating effects upon her father when Lissner denied him oxygen:  Peter became cold, pale, non-communicative, and despondent.  Libra had to urgently write to the Court to have her father's oxygen put back on.

91.     Libra's daily fear that her father's oxygen will be removed, or that Lissner will act otherwise recklessly, has caused and continues to cause her to live in a perpetual state of fear regarding her father's hastened death caused by Lissner's actions.

92.     In three years, Libra has not once been permitted to take her father to a doctor.  And as noted above, even now Lissner is refusing to permit Libra to take her father to a Pulmonologist for a full evaluation in connection with Lissner's desire to remove Peter's oxygen.

93.     In addition:

    a.  Peter has been taken by ambulance to the hospital multiple times since Lissner's appointment and Lissner has refused to tell Libra any information about the hospital visits;

b. Lissner advised Libra by email that Peter was undergoing surgery under general anesthesia and refused to tell Libra any further information;

c. Lissner refused to allow Libra to get her father medical attention when Libra believed he had had a mini-stroke in front of her eyes;

d. Lissner was unresponsive to Libra and belittled her concerns for her father when Peter's blood oxygen had dropped to a dangerously low 91% and her father was barely responsive;

e. Lissner was unresponsive to Libra and belittled her concerns for her father when Peter had severe swelling in his left arm and leg and Libra had been advised by a reputable Pulmonologist that Peter must be evaluated immediately in the hospital due to concerns about blood clots.  The same evening, the EMT was called and Lissner refused to permit them to take Peter to the hospital;

f. Lissner refuses to tell Libra which medications Peter takes;

g. During Peter's recent hospitalization, Lissner unnecessarily placed Peter in a shared room with a stranger who received multiple visitors with unknown COVID status, thus increasing Peter's risk of COVID; Lissner then reprimanded Libra when she moved her father to a private room, at her own expense; and

h. During Peter's recent hospitalization, Lissner forced Libra to turn away Private Duty Nursing care, which Libra had personally paid for.

94. Libra and her attorneys have expressly told Lissner, multiple times over the course of her appointment, of the anguish and trauma Libra suffers as a result of Lissner's refusal to share her father's medical information with her.  But, of course, Lissner's actions were and are designed to have that precise effect.

**B.    LISSNER'S DEFAMATION COMPLAINT IS AN ACTION INVOLVING PUBLIC PETITION AND PARTICIPATION WHICH SHE COMMENCED WITHOUT A SUBSTANTIAL BASIS IN FACT AND LAW**

95. Lissner's most recent vindictive act was the filing of her frivolous Defamation Complaint which, as demonstrated below, is riddled with lies.  Lissner's Defamation Complaint is a blatant violation of New York's recently expanded laws prohibiting SLAPP suits.

96.     Under New York's anti-SLAPP laws, a lawsuit based upon "any communication in a place open to the public or a public forum in connection with an issue of public interest" (which Lissner's defamation suit unquestionably is—Libra is being sued for publicly critiquing how Lissner performs her official duties as a court-appointed guardian, towards a famed and beloved New York icon, in the context of a guardianship system that is currently under nationwide scrutiny) cannot be maintained (and indeed subjects the plaintiff to costs and attorney's fees, at a minimum) unless the cause of action "has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." *See* N.Y. Civ. Rights Law § 70-a(1)(a); *id.*, § 76-a(a)(1); CPLR § 3211(g).

97.     Far from having a "substantial basis" in law (*see* CPLR § 3211(g)), Lissner's defamation claim is not cognizable at law at all (*see* CPLR § 3211(a)(7)):  not only are Libra's statements not defamatory—they are among other things, either true, are statements of opinion, and/or are or are too loose, figurative, hyperbolic or otherwise incapable of a defamatory meaning, and are certainly not defamatory per se in connection with statements alleged to have been made regarding Lissner's commission of a crime—but they were no more than a fair and true report of a pending judicial proceeding (*i.e.*, the guardianship proceeding), in which Libra has filed three motions to remove Lissner as her father's personal needs guardian given her abuse and isolation of him, the most recent of which is still currently pending before Justice Lisa A. Sokoloff in New York State Supreme Court.  *See* N.Y. Civ. Rights Law § 74 ("A civil action cannot be maintained against any person … for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding…")

98.     New York law is crystal clear:  public comments, like Libra's, that simply state the allegations made in a legal proceeding cannot be the subject of a defamation claim.

99.     Lissner brought her frivolous Defamation Complaint to harass, intimidate and punish Libra for exposing Lissner's punishing treatment and financial exploitation of her father, and in an attempt to silence Libra from further exposing her abuse and unthinkable cruelty.

100.     Lissner has all-but admitted that Libra's statements are nothing more than a regurgitation of the complaints she has already made in in-court documents in the guardianship proceeding:  not only has Lissner admitted as much in statements she has recently made under oath in the guardianship court, but she has admitted as much in her utterly disingenuous Defamation Complaint itself.  *See e.g.*, Defamation Complaint, ¶¶ 2, 30, 48.

101.     Lissner's admissions are critical because it is settled law that statements like Libra's to "Good Day New York" – upon which Lissner frivolously bases her lawsuit – that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within N.Y. Civ. Rights Law § 74's privilege.

102.     Lissner's frivolous Defamation Complaint is nothing more than a continuation of her campaign of harassment against Libra and an attempt to silence her ward's daughter for exposing her abuse and exploitation.  Lissner's defamation claim lacks any basis in law or fact, let alone a "substantial" one.

## C.     LISSNER IS AN ATTORNEY AND LIED TO THE GUARDIANSHIP COURT WITH THE INTENT TO DECEIVE IT

103.     Lissner is an attorney admitted to practice in New York.  *See, e.g.*, Defamation Complaint, ¶ 55.  Indeed, she was appointed as Peter's guardian precisely because she is one. Lissner touts to the guardianship court that she is an attorney at every possible turn, presumably to give weight to her statements.  In fact, Lissner has on numerous occasions submitted affirmations, not affidavits, to the guardianship court.

104.     Though she was not counsel of record in the guardianship court, Lissner

repeatedly used her status as an attorney as she purported to fulfill her guardianship duties and relied on the use of affirmations, instead of affidavits, to submit sworn statements.  Indeed, under CPLR § 2216(a), putting aside exceptions not relevant here, affirmations may be submitted only by an "attorney admitted to practice in the courts of the state" who is "not a party to an action."  Thus, by submitting affirmations, instead of affidavits, Lissner herself took the position that she was acting as an attorney in, rather than a "party" to, the action.

105.    Additionally, Lissner seeks fees in connection with her role as guardian at her regular attorney rate.  Lissner also seeks to be paid for the time spent by an additional attorney at her firm in connection with the guardianship, also billed at that individual's regular attorney rate.  Lissner also uses her law firm's resources in connection with the guardianship matter.  Upon information and belief, Lissner's attorney malpractice insurance covers her in her role as Peter's guardian.

106.    Lissner—an attorney—has lied repeatedly to the guardianship court, with the intent to deceive it.  For example:

    a.  Lissner lied when she stated "Mr. Max is not asking to see anybody.  These are not friends that are on Mr. Max's mind.  Mr. Max is happy doing what he's doing.  He is not looking to reconnect." (Transcript dated September 25, 2019 at 37).

    b.  Lissner lied when she stated "[t]he reality is, A, he doesn't want to see anybody.  He is not asking for anybody." (*Id*. at 37).

    c.  Lissner lied when she stated "Mr. Max independently is not requesting to speak or see anybody in particular." (*Id*. at 82).

    d.  Lissner lied when she stated that it was Libra's suggestion for cameras to be planted inside Peter's apartment: "That was actually an idea that Libra made very early on . . . I do again want to stress that was something that Libra wanted." (*Id*. at 86).

    e.  Lissner lied when she stated "the only frequent source of interference to Peter's

wellbeing results from the actions of his daughter as she manipulates, fabricates, intimidates and bullies him and the people that care for and about him." (Affirmation of Lissner dated May 20, 2020, ¶ 7).

f.  Lissner lied when she stated "Libra barged into her father's apartment, agitating him, upsetting his caretakers and causing the cancellation of a previously scheduled medical appointment.  It took hours for Peter to recover from her storm."  (*Id.*, ¶ 9(m)).

g.  Lissner lied when she stated "every decision that I make concerning Peter is made solely to enhance his health, safety, happiness and welfare, with his wishes being the backdrop in my decision making process."  (*Id.*, ¶ 12(c)).

h.  Lissner lied when she stated "Peter is never forced to hang up on friends."  (*Id.*, ¶ 14(d)).

i.  Lissner lied when she stated "[e]very action that I have taken has been solely for Peter's benefit."  (*Id.*, ¶ 19(c)).

j.  Lissner lied when she stated "Libra is a threat to her father."  (*Id.*, ¶ 22(e)).

k.  Lissner lied when she stated "Libra has a history of absconding with Peter."  (*Id.*, ¶ 26(h)).

l.  Lissner lied when she stated that Libra was "harras[ing]" her.  (*Id.*, ¶ 35).

m.  Lissner lied when she stated "[Libra's] actions are part of a continuous pattern of behavior that puts Peter at risk."  (*Id.*, ¶ 36).

n.  Lissner lied when she stated that she "ha[s] been subject to systematic and unrelenting interference from [Libra]."  (Affidavit of Lissner dated July 24, 2020, ¶ 6).

107.    Libra has spent or otherwise incurred liability to pay millions of dollars in legal fees to refute Lissner's lies.

108.    Lissner also lied to the guardianship court when she stated that she "devoted a total of 1,088.48 hours to this matter from May 29, 2019 through June 30, 2020."  (Affidavit of Lissner dated July 27, 2020, ¶ 8).  Lissner's billing records themselves demonstrate that she spent nowhere near 1,088.48 hours during that period, as they are, among other things, riddled

25

with duplicative time entries and demonstrate that she is wedded to the improper practice of charging six minutes (*i.e.*, 0.1 units) for tasks that clearly took her just seconds to perform (such as merely forwarding emails and listening to voicemails).  Lissner lied to the court about the amount of time she spent on the guardianship matter with the intent to deceive it into awarding her fees to which she is not entitled.  Libra spent an ordinate amount of money on attorneys challenging Lissner's lies in connection with her billing.

D.      **LISSNER'S DEFAMATION COMPLAINT IS RIDDLED WITH BLATANT LIES**

109.     In addition to the numerous outright lies she has told to the guardianship court, Lissner lies repeatedly to the court in her frivolous Defamation Complaint.  For example:

   a.  Lissner lied when she stated that "Libra is trying to *undo* her father's wishes" (Defamation Complaint, ¶ 2):  As detailed above, Peter himself has repeatedly made his wishes well known:  he wants Lissner out of his life; he wants to see his children whenever he pleases; he wants to be "free"; and he wants his children, not a stranger like Lissner, to make medical decisions on his behalf to the extent he is unable.  (Exhibits 1-4.)  Libra is not trying to "undo" her father's wishes— she is trying to ensure they are adhered to.

   b.  Lissner lied when she stated that Peter himself "sought guardianship" (Defamation Complaint, ¶ 2); *see also id.*, ¶ 14 (stating that Peter himself "petitioned the Court for guardianship"):  Mary Max, not Peter, sought the guardianship.  Neutral guardians were ultimately put in place due to Mary's abuse.

   c.  Lissner lied when she stated that Libra "did not ask to see her father or otherwise show interest in his personal affairs" for 18 months (Defamation Complaint, ¶ 2):  As Lissner knows, during that period, Libra made multiple formal requests to the guardianship court to, among other things, shelter-in place with her father (which Lissner cruelly rejected), increase her visitation with him, and remove Lissner as his guardian, and was in constant contact with him via phone and FaceTime.

d.  Lissner lied when she stated that Libra "confiscated" Peter's cats (Defamation
Complaint, ¶ 4):  Lissner has previously admitted, under oath, that she determined
that Peter's cats must be taken from him, and after she made that decision, she
"arranged with Libra that [Libra] would pick up the cats."  (Affirmation of
Lissner dated May 20, 2020, ¶ 18(o)).

e.  Lissner lied when she stated that Libra "controls the finances" (Defamation
Complaint, ¶ 5):  Peter's finances are controlled by Peter's property guardian,
Lawrence Flynn, Esq.

f.  Lissner lied when she stated that Peter's prior personal needs guardian, Sabrina
Morrissey, resigned due to "difficulty getting along with . . . Libra" (Defamation
Complaint, ¶ 17):  Ms. Morrissey's application to resign makes clear that she
resigned due to conflict between Mary Max (Peter's late wife) and Adam Max
(Libra's older brother).  Further, Ms. Morrissey supported Libra's second
application to remove Lissner.

g.  Lissner lied when she stated that the "revolving door of guardians was the result
of Libra's actions" (Defamation Complaint, ¶ 21):  Not once did Libra make a
motion to remove any of Peter's guardians prior to Lissner, nor did the prior
guardians leave due to issues with Libra.

h.  Lissner lied when she stated that Libra refuses to wear a mask in her father's
home (Defamation Complaint, ¶ 36):  Libra has never refused to wear a mask in
Peter's home or otherwise in Peter's presence; Libra is fully vaccinated; and Libra
takes a COVID test before every single visit with her father.  Lissner is
transparently attempting to paint Libra as reckless and as someone who opposes
COVID regulations, which is simply not true.  Moreover, Lissner does *not* require
Peter's revolving door of aides to wear masks in Peter's presence when Libra is
not there—the aides have told Libra that they do not wear masks and Libra has
seen the aides multiple times on FaceTime without masks, including during the
height of COVID when testing was not yet available.  The aides do not live in
Peter's home and take public transportation to and from Peter's home for their
shifts.  If Lissner was really concerned about Peter's health, she would require the
aides to wear masks, but she does not—demonstrating that her actual motive is

not to keep Peter Max safe.  Also, shockingly, Libra arrived for one of her scheduled short visits with her father earlier this year to find yet another new aide.  Libra asked the aide if she had taken a PCR test before coming to work for her father.  The aide told her that she had not taken a PCR test in many months and confirmed that Lissner had not required her to take one before commencing her employment.  It is astonishing and dangerous that Lissner did not make the new aide take a proper COVID test before commencing her employment as Peter's carer, and this further demonstrates that Lissner's purported reliance on COVID to inhibit Libra's and Peter's interactions is feigned.

110.    Lissner is clearly willing to say and do anything to keep her grip on the life of Peter Max and her golden goose of a guardianship and, in turn, to further her campaign of harassment against his beloved daughter.

## FIRST CAUSE OF ACTION
### (Intentional/Reckless Infliction of Severe Emotional Distress)

111.    Libra realleges and incorporates by reference the foregoing paragraphs.

112.    Lissner's atrocious conduct in refusing to permit Libra to spend any meaningful time with her father at the end of his life, blocking Libra from having any insight whatsoever into her ailing father's medical condition, and in her deliberate and malicious campaign of harassment against Libra, has been extreme and outrageous, as measured by the reasonable bounds of decency tolerated by decent society.

113.    Libra has suffered severe emotional distress as a result of Lissner's conduct.  The distress Libra has endured has been of such intensity and duration that no reasonable person should be expected to endure it.

114.    Lissner acted with a desire to cause Libra emotional distress.  Lissner's desire to traumatize Libra was more than incidental to any other motive that Lissner may have had.

115.    Lissner knew, with substantial certainty, that Libra would suffer severe emotional

distress as a result of her actions.  Lissner had an utter disregard of the consequences that may follow from her actions.

116.    As a result, Libra is entitled to damages in an amount to be determined at trial, plus punitive damages and costs and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Anti-SLAPP)

117.    Libra realleges and incorporates by reference the foregoing paragraphs.

118.    Lissner's Defamation Complaint is an action involving public petition and participation, as defined in N.Y. Civ. Rights Law § 76-a.

119.    Lissner's Defamation Complaint was commenced without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law.

120.    Lissner's Defamation Complaint was commenced for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Libra's free exercise of speech, petition or association rights.

121.    Libra has suffered damage as a result of Lissner's filing of her Defamation Complaint, entitling her to both compensatory and punitive damages, in addition to costs and attorneys' fees.

## THIRD CAUSE OF ACTION
### (Violation of Judiciary Law Section 487)

122.    Libra realleges and incorporates by reference the foregoing paragraphs.

123.    Lissner is an attorney licensed to practice in New York.

124.    Lissner lied to the guardianship court with the intent to deceive the court and the parties.

125.     Libra has spent or otherwise incurred an obligation to pay millions of dollars in legal fees to refute Lissner's lies.

126.     As a result, Libra is entitled to treble damages in an amount to be determined at trial, plus punitive damages and costs and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Libra Max demands a judgement in her favor and against Barbara Lissner on each of the claims set forth herein as follows:

1.   awarding Libra her reasonable attorneys' fees and costs incurred in this action;

2.   awarding Libra compensatory damages in an amount to be determined at trial;

3.   awarding Libra punitive damages; and

4.   awarding Libra such other and further relief that may be just and proper.

Dated:  New York, New York
        June 16, 2022

SCHLAM STONE & DOLAN LLP

By: _____
Jeffrey M. Eilender
Douglas E. Grover
Joshua Wurtzel
26 Broadway
New York, New York 10004
Tel: 212-344-5400
Fax: 212-344-7677
jeilender@schlamstone.com
dgrover@schlamstone.com
jwurtzel@schlamstone.com

*Attorneys for Plaintiff Libra Max*